HENRY DOBBINS & others *vs.* FRANCIS H. PEABODY
& others.

Suffolk.    January 15, 16, 1908. — May 22, 1908.

Present: KNOWLTON, C. J., HAMMOND, LORING, SHELDON, & RUGG, JJ.

*Trust.    Corporation.    Meigs Elevated Railway Company.*

In a suit in equity to establish a trust for the benefit of the plaintiffs in a sum of
$400,000 alleged to be the proceeds of a transfer of the charter and control of
the Boston Elevated Railway Company, the plaintiffs were stockholders of the
Meigs Elevated Railway Company and contended that the stockholders of that
company employed two of the persons who afterwards became incorporators of
the Boston Elevated Railway Company as their attorneys to procure the incor-
poration of the last named company, and that such incorporators stood in a
fiduciary relation toward the plaintiffs. A master to whom the case was referred
found that the incorporators in question were not employed as such attorneys,
and that no fiduciary relation existed between the plaintiffs and any of the de-
fendants, but that the incorporators and the other persons who worked to pro-
cure the charter of the Boston Elevated Railway Company did so for their own
purposes and in no way as representing the interests of the plaintiffs. A single
justice confirmed the master's report and dismissed the bill, and on appeal this
decree was affirmed by the full court.

Under Pub. Sts. c. 105, § 9, now R. L. c. 109, § 13, the persons who hold the fran-
chise or privileges granted to a corporation by a special charter, until the corpo-
ration is organized, are the incorporators named in the act of incorporation " and
their associate subscribers to stock before the date of the act," and, if at the date
of the act no stock has been subscribed for, the persons named in the act are
the only persons in whom the franchise rests before the organization of the
corporation.

BILL IN EQUITY filed in the Supreme Judicial Court on Sep-
tember 1, 1899, for the purpose stated in the opinion, where also
the decree and appeal are stated.

The case had been referred to Benjamin N. Johnson, Esquire,
as master. The portions of the master's report especially re-
ferred to in the opinion were as follows:

" As to the claim of the plaintiffs that certain of the stock-
holders of the Meigs Elevated Railway Company associated
together in 1893 or 1894 and employed Towle and Howland as
attorneys for the stockholders of said company to obtain this
legislation, I find that there was neither such association nor
such employment. The plaintiffs, that is, the stockholders of
the Meigs Elevated Railway Company, did not employ Towle

and Howland, or either of them, as their attorneys to secure such legislation, nor did such stockholders take any action, part, or interest in securing the same, except as herein appears. There was, in 1893 and 1894, no relation established between Towle and Howland, or either of them, on the one hand, and the body. of stockholders of the Meigs Elevated Railway Company on the other, except that which arose from the relation of Towle and Howland to the Meigs Elevated Railway Company as a corporation, and that relation was clearly determined by the agreement of October 9, 1890. Unless the court shall otherwise construe its provisions, I find that this agreement did not establish the relation of attorney and client, and did not create a trust relation between the parties, as claimed by the plaintiffs. I also find that the actions and statements of Towle and Howland prior to and subsequent to the execution of said agreement, taken in connection with said agreement, did not create any such trust relation. The agreement provided that when ' any corporation organized by Towle and Howland' should be granted the right to use the Meigs system, the Meigs interests were to be paid in the form of stock in such corporation ' a royalty for and in full payment of all claims for royalties for the use of the patents of said Meigs system.' On the other hand, the agreement clearly contemplated that Towle and Howland were to labor at their own risk, both as to their services and disbursements. The only compensation open to them was by way of a possible profit arising from their securing, in any arrangement they might make for the use of the Meigs invention, a larger consideration or allotment of stock than that which they were required by said agreement to turn over to the Meigs interests. Towle and Howland did not obligate themselves to continue such efforts any further than they deemed it for their own interest so to do. Such an arrangement negatives the suggestion of a trust, and was wholly inconsistent with the relation of attorney and client. During the three years ending October 9, 1893, the only relation between Towle and Howland and the Meigs Elevated Railway Company was the contractual one established by said agreement, except that Towle was, or claimed to be, a stockholder in said company. Subsequent to October 9, 1893, the relation was the same as during the previous three years. It

does not appear that the agreement of October 9, 1890, was extended, or that any notice was given of its termination. No new arrangement or agreement was entered into. Whether the agreement of October 9, 1890, remained in force for all purposes or not, therefore, the relationship of Towle and Howland to the Meigs interests, and therefore to the Meigs Elevated Railway Company, was the same as while said agreement was in full force. It was expected and understood by the Meigs interests that Towle and Howland were devoting their time and energy to the promotion of the Meigs inventions without compensation and at their own risk and for such profit as they might be able to make in securing the use of such inventions by any corporation which they might organize ; and it was understood by the Meigs interests that the only way in which they were related to these efforts of Towle and Howland was that they would be entitled to receive royalties, or other similar compensation, for the use of the Meigs inventions, either on the basis fixed by the agreement of October 9, 1890, or on some other basis to be agreed upon in the event that Towle and Howland should succeed in securing the construction of a railroad upon the Meigs system. Such royalties could not be properly payable unless a practical use of that system could be made, or, at least, determined upon, by investing capitalists. It was only in that event that the Meigs interests could realize anything under their patents; and they assumed no responsibility for the efforts or disbursements of Towle and Howland, who, on their part, must succeed, not only in securing a satisfactory charter, but in inducing capitalists to invest money in the building of a railroad upon the Meigs system, in order to enable the Meigs interests to receive their expected profit.

.    .    .    .    .    .    .    .

" In conclusion I find that, there being no trust relation between the plaintiffs and Towle and Howland, and there being no employment by the plaintiffs of Towle and Howland, or either of them, as their attorneys to secure said act of 1894, and Towle and Howland having secured said act and the charter embodied therein as the result of their own labors, and at their own risk, the plaintiffs had no interest either at law or in equity in said act of 1894, and said charter, and that they were not, therefore,

in any way interested in the proceeds of the sale thereof to Morgan.

" The plaintiffs requested me to find that Towle was the personal counsel of Meigs during the legislation of 1894 and in obtaining that legislation, but I do not so find. Evidence was introduced by the plaintiffs, in the form of statements by Meigs and otherwise, tending to show such a relation on the part of Towle to Meigs, or at least that Meigs so considered the relation, but upon all the evidence I find that Towle was acting on his own account in securing the legislation of 1894, and that while he did not appear openly as a petitioner, he in fact had the interest of a petitioner in the proposed legislation. It is true that Meigs looked to Towle to protect his interests, and frequently referred to Towle as his attorney, and that he trusted him in all legal matters in the same way that a client would trust his attorney, but Meigs nevertheless understood that in striving for the legislation Towle was working with him and not for him.

" The plaintiffs also requested me to find that the defendant Howland was the legislative counsel of Meigs with reference to securing said legislation, and that he filed his appearance as such on the docket of legislative counsel at the state house in 1894. I find that Howland did so file his appearance, but that the purpose of filing the same was to enable Howland to appear without question before the appropriate committees in behalf of the petition without disclosing the fact that he was in fact jointly interested as a petitioner.

" As to the relation of the plaintiffs to the defendant Meigs, I find that the action of Meigs in conjunction with Towle and Howland in securing the act of 1894 was prompted by his own interests, and that he was not so related to the plaintiffs that he was bound to hold the result of his efforts in trust for the plaintiffs so far as they related to the procurement of said act and the disposition of said charter. He was one of the largest equitable owners in the patents, and was therefore greatly interested in having his invention introduced into actual use. Besides this, he had an especial pride in his system, and having devoted twenty years to its development and exposition, it was one of the objects of his life to see it put into practical use. It is true that it was

for the possible advantage of those owning an interest in the Meigs inventions that Meigs should assist Towle and Howland in all their efforts to secure the construction of a road upon his system. He, more than any one else, stood for and believed in that system and was best able to expound it, but he also, so far as the plaintiffs were concerned, labored on his own initiative and at his own risk. Had he succeeded in demonstrating to capitalists the value of the Meigs system the patent owners and those associated with them might have profited by such demonstration. In this, however, he did not succeed, although I find that it was his purpose and intention throughout his action in this matter to secure the adoption of the Meigs system, and that he, in good faith, made every effort in that direction.

"Towle and Howland requested his help in what they were seeking to accomplish, and Meigs appears to have had an agreement with Towle at one time that he should share with Towle in any profits which might be made in the enterprise. Meigs accordingly assisted Towle and Howland in securing the act of 1894, and when the control of the charter embodied therein was turned over to Morgan in 1895, Meigs joined in effecting the transfer. I find, however, that Meigs did not understand, at the time of the transfer to Morgan, that such transfer meant an abandonment of the Meigs system, this fact not having been communicated to him.

"As to all the incorporator defendants, I find that it was understood by them, and intended by the Legislature, that those who were named in said act as incorporators of said Boston Elevated Railway Company should be such incorporators in their own right, and not as representing the plaintiffs or any other persons, and that they, the incorporator defendants, had no knowledge of any interest on the part of the plaintiffs or the stockholders of the Meigs Elevated Railway Company, other than their supposed interest in the Meigs inventions and the right to compensation for the use of such inventions, when, as was at first intended, the road should be built upon the Meigs system.

"As to the claim of the plaintiffs that they were associate incorporators under the act of 1894, I find that, being neither named in said act nor being associate subscribers to stock in said corporation before the date of said act, they had no stand-

ing as incorporators, and had no interest as such in the franchises and privileges granted to said corporation. I find, also, that the Legislature had no intention to make the plaintiffs associate incorporators in the Boston Elevated Railway Company.

"I therefore find that the incorporators of the Boston Ele-vated Railway Company who were named as such in said act took and held the charter thereof in their own right, and that the plaintiffs have established no claim thereto or to the proceeds of the transfer of the control thereof."

The following is a copy of agreement of October 9, 1890, referred to in the master's reports and in the opinion:

"Memorandum of Agreement made and concluded this ninth day of October A. D., 1890, by and between the Meigs Elevated Railroad Company the Meigs Elevated Railway Construction Company, all of said Boston, and James L. Meigs trustee of the Meigs patents, parties of the first part, and George H. Towle and Willard Howland parties of the second part,

"Witnesseth

"That for and in consideration of one dollar and the covenants and agreements of each party with the other the parties of the second part covenant and agree that of all the capital stock of any corporation organized by them to operate a railroad in the Commonwealth of Massachusetts under the Meigs system or in accordance with any part of said system there shall be issued and delivered to the order of the parties of the first part in writing an amount of such stock equal to twenty-five per cent. thereof, within ninety days after said corporation or either of them shall be organized or any stock thereof issued, and that the stock so delivered shall be fully paid up and non-assessable, which said stock shall be received by the parties of the first part for and in full payment of all claims for royalties for the use of the patents of said Meigs system and for its use, construction and operation within said Commonwealth. Provided However, that no stock or other compensation for such royalties shall be paid for or on account of the first five miles of said road constructed and operated by said parties of the second part within the territory of Massachusetts.

"And it is further covenanted and agreed by and between

said parties that said party of the second part may make, build, maintain, equip and operate the Meigs system of said Elevated Railroads as the same now is or may hereafter at any time be secured by letters patent to said Meigs or his assigns or any person for his benefit or use for improvements thereon within said territory of the Commonwealth of Massachusetts provided said first five miles shall be equipped and put in operation within three years from the date hereof, which said provision is part of the consideration and the condition of this contract.

·"Provided that this agreement shall be an exclusive license from said parties of the first part or any license thereof for building, maintaining or operating of any railroad within said limits for said three years, and if duly performed for the lifetime of said patents.

"And it is further covenanted and agreed between said parties for the consideration aforesaid that said party of the second part are licensed to construct build and operate a railroad or railroads upon said system in any part of the United States other than the State of Massachusetts upon the same terms and conditions save as to building the first five miles, provided that the party of the first part may grant a license to any person or corporation to build said railroads according to said system outside of the State of Massachusetts, but in such case the parties of the second part shall have the right to build, maintain and operate said system upon the same terms and conditions as such license shall be given to the parties so licensed to build a railroad under said system in any other part of the United States.

"And said parties further covenant and agree for the consideration aforesaid that any railroad made and operated under said Meigs system with its rolling stock and appurtenances may be established and used within said territorial limit of the State of Massachusetts by a railroad or railroads built from a point beyond said territorial limits of Massachusetts and running into such termini within said limits as said party of the first part will authorize and license so to do, but that said railroad shall not take up or deliver or set down any passenger or freight at any point or station within said territorial limits except at such terminal depots as said railway so established may set up. But such railroad or railroads shall not be located either in their

course or in their terminal depots as to obstruct or hinder the construction or operation of said Meigs Elevated Railroad within said territory of Massachusetts.

" And it is further covenanted and agreed between said parties that whenever any said parties are mentioned in this agreement the agreement shall read and be construed and read as if the words " or their legal representatives or assigns " had been written therein after the name of either of said parties.

" Witness the hands and seals of each of said parties of the first part and said parties of the second part respectively the day and year first above written.

> "Meigs Elevated Railway Co.
> > By Joseph H. O'Neil,
> > > President   [Seal]
> > > Noah A. Plympton,
> > > > Treasurer   [Seal]
> > > Willard Howland          [Seal]
> > > Geo. H. Towle            [Seal]
> > > James L. Meigs,
> > > > Trustee      [Seal]
> > Meigs Elevated Construction Co.
> > > By Benj. F. Butler,
> > > > President    [Seal]
> > > Wm. S. Butler,
> > > > Treasurer."   [Seal]

Here followed the names of witnesses to the several signatures.

*A. Lincoln*, (*H. W. Ogden* with him,) for the plaintiffs.

*H. N. Allin*, for Joe V. Meigs.

*W. Howland*, *pro se*, and for Charles A. Whittier and others, administrators.

*W. A. Gaston, F. E. Snow & R. M. Saltonstall*, for Kidder, Peabody and Company, submitted a brief.

*S. K. Hamilton*, for William Spalding, was stopped by the court.

HAMMOND, J.   This is a bill to establish and enforce a trust in favor of the plaintiffs as stockholders in the Meigs Elevated Railway Company, in the sum of $400,000, that amount being

alleged to be the proceeds of a transfer of the charter or control of the Boston Elevated Railway Company. The case was referred to a master, and is before us upon an appeal from a decree that the plaintiffs' exceptions to the master's report be overruled, that the report be confirmed and that the bill be dismissed with costs.

As stated in their brief, "The substance of the plaintiff's claim is that they were associated with the incorporator defendants, and more especially with Meigs, Towle, and Howland, in a common undertaking, to wit, to develop, finance, and bring into practical operation the Meigs system of elevated railways, in which the plaintiffs especially had been interested for a long term of years," and that " Out of the fact of this association for a common object . . . there springs a fiduciary relationship and a duty of fidelity to one another which requires each one to account for benefits and advantages received in the prosecution of that object."

There can be no doubt on the facts found by the master that the plaintiffs were interested in the success of the Meigs system and that they, as well as the defendants, worked for its success, but it by no means necessarily follows that the relations between the plaintiffs and the defendants or either of them were of a fiduciary nature. The contention of the plaintiffs that Towle and Howland were employed by certain of the stockholders of the Meigs Elevated Railway Company to obtain the legislation of 1894, by which the charter was granted to the Boston Elevated Railway Company, is negatived by the master, who has found that there was no employment. For the reasons stated by the master we agree with him that the agreement of October 9, 1890, did not as matter of law establish the relation of attorney and client between the parties thereto. True it was an agreement looking to the accomplishment of an end desired by all parties thereto, but neither party was to act as the agent of the other and each stood at arm's length from the other. The finding of the master that no trust relation was created by that agreement or by the acts and statements of Towle and Howland before and after the execution of it, taken in connection with it, is not inconsistent with the other facts and must stand.

Upon the general question whether for any purpose and to

any extent there was a trust relation between the plaintiffs and any of the defendants, the master has made an exhaustive statement of the facts and circumstances; and without going further into detail it is sufficient to say that for reasons stated by him in his report we are of opinion that his general finding to the effect that no such relation existed is amply warranted by the subsidiary material facts upon which he bases it, and that no error appears in his rulings as to the law. The allegations of the bill as to the existence of a fiduciary relation either as attorney and client or otherwise, are not sustained.

It is urged further by the plaintiffs that within the meaning of Pub. Sts. c. 105, § 9, they were associates of the incorporators, but that position is untenable. The plaintiffs were not named specifically in the act, nor had they subscribed to the stock before the date of the act of incorporation, nor had there been any subscribers to the stock before that date. The persons therein specifically named were therefore, by the plain terms of the statute, (Pub. Sts. c. 105, § 9,) the only persons in whom the franchise rested before the organization of the corporation. *Lechmere Bank* v. *Boynton,* 11 Cush. 369. *Roosevelt* v. *Hamblin, ante,* 127.

Hence the general finding of the master that "the incorporators of the Boston Elevated Railway Company who were named as such in said act took and held the charter thereof in their own right, and that the plaintiffs have established no claim thereto or to the proceeds of the transfer of the control thereof," must stand. As this disposes of the plaintiffs' case it becomes unnecessary to consider the other grounds of defense; and the exceptions to the master's report, so far as they relate thereto, become immaterial. The result is that the decree must be affirmed.

*Bill dismissed with costs.*